The next case is Dennis and Susan Gomas v. United States. Tyler DeWitt is here for the appellants. Nishant Kumar is here for the United States. And Mr. DeWitt, you may begin when you're ready. Thank you, Your Honors, and may it please the Court, as the Court has already mentioned, my name is Tyler DeWitt and I'm counsel for the appellants in this case, Dennis and Susan Gomas. And, Your Honors, we're here today seeking justice, not just in the technicalities of the federal income tax law, but in the spirit of fairness regarding a really tragic circumstance. As you guys know, Your Honors know, this case involves an elderly couple who fell victim to an unconscionable scheme perpetrated by their own daughter. Elderly? They're about the same age as I am. No comment. Your Honor, we're going to move on. You should say you rest your case. But their own daughter defrauded them out of $1.2 million of their hard-earned money. You've got all the sympathy, but your legal issues are distribution and an ordinary business expense. Absolutely, Your Honor. I think you should get to those. I mean, I'm sympathetic. I believe I'm older than Judge Wilson. I'm as sympathetic as I can be to your clients, but we've got to apply the law. So tell us about the law. Absolutely, Your Honor. Well, I think the overarching issue here, Your Honor, is the sufficiency of the summary judgment evidence that was presented by the government in this case. The trial court flat-out stated incorrect facts that were absolutely in dispute here, Your Honor. There are— Let me help you. On distribution, the government's strong case is distribution means transfer. That's the plain meaning of it. And in this case, the Gomez voluntarily requested a transfer of funds from IRA to their bank account, and they got it. So that's a distribution. Yes, Your Honor, but we'd point the court's attention to the concept of an economic benefit. Yeah, but it's not in the statute. I mean, the IRC code, the regs, don't say anything about economic benefit. If I go and take money out of an IRA account and put it in a latest, hottest crypto account, the fact that that crypto account is a Ponzi scheme, as it turns out, doesn't mean that I don't owe income tax on the withdrawal. Your Honor, we'd submit that fraud certainly has an impact on the idea of dominion and control in that type of circumstance. And I understand there's very limited case law regarding this issue, but I'd direct the court's attention to the tax court who addressed this fairly head-on in Bunny v. Commissioner, where a taxpayer, under Section 408 D.1 of the tax code that we're dealing with here with what is a distributee, right, that they have to receive an economic benefit. No. No. They didn't have a case where the taxpayer voluntarily requested and received a transfer of assets out of an IRA to the taxpayer's bank account, which the taxpayer then spent. Your Honor, we'd submit this is certainly a case of first impression with those circumstances. I would direct the court's attention again to the Supreme Court's prevailing decision in Commissioner v. Lester of substance over form, and that fraud here negates this idea that this was voluntary. They were under the guise of helping and funding their business, that they were still kind of keeping the rate. There's no fraud exception in the statute, right? No, Your Honor. The statute, kind of like many tax statutes, is silent to that material issue. When we look at the tax court cases to help us, to give us guidance, the critical determination appears to be who has dominion and control over the money when it's withdrawn, including the power to dispose of the funds when the withdrawal takes place, and not how the taxpayers use the money after that. So when they withdrew that money before they gave it to their daughter, didn't the money that they had dominion and control, and it increased their wealth, and what they decided to do with the money after that, you know, it doesn't divest them of the economic benefit that they obtained when they withdrew the money. Certainly, Your Honor. And I want to point the court's attention back to Section 162A of the tax code, the ordinary and necessary business expense deduction. Our 408 argument, Your Honor, I would submit is an alternative theory, and we can come back to that shortly, but I want to emphasize the significance here of these being business deductions, because the trial court and the government, they've got this mistaken idea that the Gomez's were completely retired. They had nothing to do with this business, that it was inactive, and that they were just giving money to their daughter, and that's simply not true, Your Honor. There's three very important factual items that were very clear, even in the government summary judgment evidence. One, the fact- When they withdrew the money, and they had it in their possession, that's not an economic benefit that they had before they gave it to their daughter? We would submit no, Your Honor. But under our, what I would say is the primary theory of this case, that this is a business expense deduction. This was an active trader business, the 2017 tax return for the Gomez's on Schedule E reflected a S-Corporation tax return that was filed by My Pet's Pride, which is the underlying business year. The trial court jumped the gun. This case was certainly not right for summary judgment, and they made this factual determination. In fact, they stated in the trial court- His lawsuit against the bank, the Phantom lawsuit against the banks, even if it had been genuine, is not an ordinary, unnecessary business expense. That was his claim that he had been done wrong by the bank, so far as we can tell from what she told him, Anderson told me. And that money would have gone to him, not to the business. Well, Your Honor, I would submit that this is akin to the case that was decided by this court, McKinney v. U.S. Before you submit that, was my recounting accurate? No, Your Honor, I would submit that the fraud that was perpetuated here by their daughter was she basically catfished. She pretended she was an attorney in Tampa, and she was, you know, submitting and drafting up fake charging documents against Mr. Gomez for merchant service chargebacks related to the business. I understand that part of the case. I'm asking you about the chunk of money involved in when she said, we've got this case going on your behalf, where you can recover money against all these banks for allowing this to happen. Now, that's a different set of issues and money than, let's play the chargebacks. How is it an ordinary and necessary business expense to finance a lawsuit against banks for what they did to him personally? Well, I believe the timing of those two legal matters is important because we would submit that the first issue that was prevailing with the fraud that was perpetuated by the daughter was to pay those chargebacks that were at issue. And then the subsequent lawsuit was to recover what they had already paid. So Your Honor, it's recovering an ordinary… Not recovering it against the merchant's account. They're recovering it from the banks under the imaginary lawsuit, right? Correct. But I would submit that that imaginary lawsuit, at worst, Your Honor, this is not right for summary judgment. Additional discovery is necessary. We don't even know from the trial court's order what percentage was what. How much of this, you know, tax law… I understand that. But in ruling on the legal issues, one of which is, is any of that money that she got under the pretense that there would be a civil suit filed for his benefit, is any of that money deductible? We would argue, Your Honor, yes, that it is. It's related to… It's, again, just like this court decided in McKinney, it's got an underlying business purpose related to the merchant service chargebacks that these banks… What is the business purpose of suing banks on his personal behalf? Your Honor, this is a closely held business. This is related to his investment. He was funding the operations of the business that ultimately, subsequently, is going and trying to recover what they paid and… But the lawsuit wasn't filed on behalf of the business. Well, Your Honor, I would submit there was no lawsuit ever filed. It was… Okay. Then you don't have an ordinary and necessary business expense. Unless there was a lawsuit that was claimed to have been filed on behalf of the business. Well, sure, Your Honor, it was certainly claimed to have been filed on behalf of the business, but… Where is that in the record? I believe that's in Ms. Anderson's deposition testimony, that this is, you know, I believe the court may be conflating two things here. This is a closely held business. This is, again, akin to the parties in McKinney v. U.S. where they've been winding down a business. Your position is, on the narrow issue that's before us, on the ordinary and necessary business expense, anything that benefits the principal, former principal, benefits the business? No, Your Honors. We would submit that what the principal was related to, what he specifically incurred out of pocket, was directly related to his closely held business that he was the sole shareholder of. And that's exactly what happened here. Your Honor, retirement doesn't bar deductibility, just like the court ruled in McKinney that just because the business had been winding down doesn't mean that he can't still deduct the legal fees that were incurred to protect and recoup the money that was, you know, paid ultimately to these false merchant service chargebacks. Your Honor, this is basically penalizing people for trying to take care of their bills that were related to their business. To the Gomez's at the time, at issue in 2017, there was no idea that this was fraud. This was a legitimate business expense that was incurred for their business. In the deposition testimony of Ms. Anderson and Mrs. Gomez, the Gomez's were very much actively involved in the operations of My Pet's Pride in 2017. Again, the company had a tax return. That tax return flowed through to the Gomez's tax return. It was active. It was operating. They were infusing cash. Mrs. Gomez, in her deposition testimony, stated that she was preparing the sales tax returns. She was infusing cash into the company. They were very much actively involved, and the trial court flat out got it wrong and made their own determinations, weighed the evidence, which you can't do in a summary judgment case. You have to accept what the non-moving party summary judgment evidence reflects, as this court determined in Mosby, Jefferson City Board of Education. The court here jumped the gun and basically picked the fruit here before it had ripened. All right. We reserve some time. Mr. DeWitt. Let's hear from Mr. Kumar. Good morning, your honors. May it please the court. Thank you. Nishant Kumar for the United States. First, I want to point out that my friend on the other side referred to the Ms. Anderson deposition as evidence, but one of the problems for their case is the Ms. Anderson deposition was never put into evidence before the lower court or this court, so all you have really is a counsel's summary judgment briefing in the court below saying what Ms. Anderson purportedly testified to in the deposition without any evidence. I'd like to... Could you address the, just as a place to start, could you address the deductibility as business expenses, because it does seem like that's their better argument to me. Sure, your honor. So I think, and I think it was, got confused at the end when we all started talking as if there were true legal expenses being paid and incurred or true merchant chargebacks being reimbursed. Remember this, we all know now, and the taxpayers don't dispute, that the money they gave to Ms. Anderson was based on lies. There were no lawsuits. And so I think their argument turns on, so to get back to section 162, which governs deductions for business expenses, the statute actually imposes four different requirements in this one short sentence. It requires that these expenses, expenditures be ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. And the fact that the Gomez's were turning over money to a con artist kind of simultaneously defeats a lot of those requirements. First, the biggest problem is, of course, well, before we start, one thing to keep in mind is we consider the true nature of the expenditures, not what the Gomez's believed at the time the money was going to. Don't the cases say that the business expenses may be deductible if the taxpayers reasonably believe that they were paying business expenses? I didn't see that, Your Honor. I saw that all the cases that touch on reasonability, maybe because there haven't been situations where for the first time the taxpayer is claiming business expenses after already learning that the expenses were fictitious. I think the reasonableness limitation comes in once you have the true character of the expenditures in mind, and then you determine based on their true character whether a reasonable businessman would have incurred those expenses. But I searched far and wide and couldn't find a case in which the reasonableness inquiry had kind of burrowed backwards into allowing, even if there's a reasonable misimpression about the nature, the entire nature of these expenses, that the court would overlook what everyone knows was the true nature of the expenditures. Let me ask you this. Suppose somebody has a supplier. The supplier gets purchased or taken over, merged, whatever, and to make payments in advance for the suppliers to run the business, legitimate business. And unknown to them, it's a bunch of crooks that have taken over the supplier. And it's all a fraud, a hoax, a whole business, and they pay a hundred grand and get nothing in return other than a postcard from the crooks in the Caribbean. Okay. Now, that is deductible if they in good faith believe that that was a legitimate charge. Is it not? Yes, Your Honor. I think a lot of the hype, so including with that hypo, the key thing to remember is in the course of tax administration, there's no God's eye view. So you have only what people know at the time. So in your situation, and I can point to a couple of embezzlement cases in which kind of play that out, where, look, the charges are facially reasonable, right, because this is a real business and this was a real supplier. And so the taxpayer, during the tax year in question, is going to sincerely believe they were paying for this vendor. No, no. My hypothetical is a bunch of crooks come in and take over the supplier and pretend to everybody they're going to keep supplying, send your advance orders and money. Sure. All right. So 30,000 foot view, that's legit. Well, what I'm saying is the taxpayers in your hypothetical are going to contemporaneously claim what they paid the supplier as business expenses because according to them, as far as they know, they were business expenses. And because this is still a facially reasonable business and supplier situation, the IRS is going to allow it. You keep forcing me to refine the hypothetical to get to the truth question I've got here. Suppose it happens in January. They discover it in February, okay, then claim it. But suppose it happens in November, they don't discover it till the next March and they didn't claim it. They've already filed their tax returns and didn't claim it because they didn't know it was a hoax. They didn't know it was fraud. Now that doesn't affect anything that we're talking about. They had a reasonable good faith belief and if you have a reasonable good faith belief, it's deductible I think some of the cases say. So one chasm between our case and the case you're describing is that in this case, the taxpayers started claiming this as a business expense deduction for the first time after everyone had discovered the theft, right? So this is not a situation where in 2017 when they were completing their returns, they thought these were business expenses, which consistent with the idea that they were proceeding under this fiction, they should have done that, but they did not claim these as business expenses in their original 2017 return. Therefore what? You can file them in the return. Always file them in the return. Sure, but you do not have a situation in which a taxpayer thought these were legitimate business expenses, contemporaneously reported them as business expenses, then realized later on that they were the victim of theft. You have a taxpayer, which is why probably the case law, you know, there's not much tracking. You have a taxpayer that only after they realize they've been the victims of theft, they go back and try to characterize what they know. Therefore, that shows what? Other than the fact that you draw a difference between that and other cases. What relevant component, element, predicate fact does that show? Sure, Your Honor, I think that the cases have all hewed to the idea that once it is known what the actual nature of the expenses were, including in your case of the thieves in the I have not seen any court say we are going to go back to supposing that the expenses were what the taxpayers supposed them to be, which we now know is not the truth, and make the reasonableness determination from that point on. I think cases have always dealt with, because everyone's agreed what the true character of the expenses was, then they decide whether those expenses were nonetheless reasonable, unnecessary, excessive. I'm not going to use all of your time, I promise, but I don't understand that. If they could deduct them at the time, and they didn't, but they file an amended return and say we're entitled to deduct these as ordinary and necessary. We didn't know we were going to have to, but now we know we're going to have to. I don't understand under the tax code. Y'all don't usually, the IRS doesn't usually say we've got to cut these folks some slack because at the time they didn't know this was deductible. Well that's, so that's kind of with your hypo, Your Honor. That's what I was saying. In your hypo, the taxpayers would have contemporaneously claimed those expenditures as business expenses. Or, because I have cases where, there's cases where the taxpayers... So are you saying they knew they weren't business expenses at the time because they didn't claim them and therefore they're stopped from claiming them now? No, I'm saying that the cases have all been that the taxpayer and the tax court rules on the deductibility of the expense in view of what everyone, the current state, what everyone knows the nature of the expense was. There are no cases that I could turn up where a tax court said we know these were fraud, but you reasonably believed at the time that they were something else. So we're going to apply that reasonable taxpayer's point of view in determining deductibility. So if you pay an expense during a tax year, incurred during the tax year, cash basis, and it turns out that was a fraud, the IRS disallows that? Yes, Your Honor. So in your cases saying that that's permissible, does this allow? Yes, Your Honor. So I'd like to, if I could point you to two cases. There's B.K. Cook v. Commissioner. That's in the Fifth Circuit, 1978. The citation is 584 F2D 53. And another case called Wintner v. Commissioner. That's TC Memo 1977-144. And in both those cases, both those cases show what usually happens as a practical matter in these situations, which is the taxpayer, there's an accountant in the business that's embezzling, and he's preparing fake invoices for goods that the business isn't receiving, right? The taxpayer has no reason at the time to believe, to realize that. So they file in whatever tax year X, 1977, they file claiming those fake invoiced goods as business expenses. And because facially everyone's reasonable, the IRS, again, also doesn't have a god's eye view on the situation. The IRS grants them the deduction because it seems to all the world at that time that those things are reasonable business expenses. Now, years later, in both these cases, years after the taxpayers already received the business expense deduction, they realized there was embezzlement. They claim now, this was back when the theft loss deduction was still allowed. They say, well, now we realize there were never any goods that, you know, corresponding to these invoices. We're claiming theft loss. And actually, in that case, because of this understanding that it's the true character of the expenses at the time that the tax controversy, you know, we don't ignore what we now know to be the true character of the expenses. In those two cases, actually, the taxpayers received a windfall because both the courts said, well, now we know these were actually theft losses. So, in those cases, the taxpayers actually benefited from this general rule that it's the true character of the expenditures that determine the tax consequences, not what the taxpayers may have reasonably believed sham expenditures to be. Just a couple other points. First, there was some discussion in the lower court and before your honors about kind of the unforeseeable injustice of this situation. And I don't think it was unforeseeable. Of course, the Gomas are a particularly egregious example of a theft loss, right? Retirement savings empty, a mature couple, not an elderly one, and by their own daughter to boot, right? There's no minimizing the awfulness of that situation. But everyone also agrees that the theft loss deduction, were it still available, would squarely cover this situation. And it's the fact that Congress suspended or eliminated the theft loss deduction as part of a policy choice in passing the Tax Cuts and Jobs Act, that they suspended it for the years 2018 forward, that creates this tax consequence. And while the Gomas may be a particularly unfortunate example, they're actually emblematic of what a theft, so every theft loss, right, that would have been the basis of a theft loss deduction involves a theft, which is, you know, a theft always involves a victim. And in the year before the theft loss and casualty deduction, so they're often grouped together for tracking purposes, in the years before this deduction in Section 165, theft loss and casualty deduction was taken away, about 100,000 taxpayers claimed a theft or casualty loss. Now, I don't have a breakdown as between those two categories, but in the aggregate. And the total claim, claimed losses came almost to $3 billion. So again, we don't know what portion is casualty, what portion is theft, but if even... But if they were taking these deductions today, they'd get them, all right? No, Your Honor. No, no, if the theft loss deduction hadn't been taken away for the years 2018 forward, including 2019, when this... So a theft loss for the tax code, the theft loss is sustained when it is discovered. And it was discovered in 2019, therefore it was sustained in 2019, which is a year when the theft loss deduction was not available. All right. But... We have your argument. Thank you, Mr. Kumar. Thank you, Your Honor. Mr. DeWitt, reserve some time. Yes, Your Honor. The government unreasonably restricts the, I think, the interpretation of Section 162a, as Judge Carnes, I think, kind of went through in that hypothetical. The mere availability of multiple routes to deduct a certain expense does not preclude the deduction at all, right? As the opposing counsel mentioned, in those two tax court cases, the taxpayer was able to receive a windfall. They actually were able to deduct those, make those business expense deductions, and then they were also able to take that theft loss deduction. The change in the law of one of those deductions does not preclude the other, as the court's decision, I believe, renders, right? They still allow the 162a, ordinary, necessary, reasonable business expense deductions. Let me ask you to address McKinney. So you cite McKinney for the principle that I think that, like, you know, lawsuit payments can be deductible as business expenses. But in McKinney, we said that if the purpose of defending the lawsuit or advancing the lawsuit was about personal liability, then it's not a business expense. And I realize here there was no lawsuit, right? So we don't really know what the lawsuit was about. But it seems like, even if we were to apply that reasoning here, that what the, what your clients were doing was trying to avoid personal liability through some kind of fictional lawsuit, and not actually trying to defend or advance the position of their business. Your Honor, I would submit that the court in McKinney, they used the underlying minimal relationship test from this court's decision in Brandeview, Commissioner, that there's a standard, it's a low bar, Your Honor. There's got to be a minimal relationship to the underlying business. And so in this case, while, yes, the form of this scenario would appear that it's, you know, the party's name in this fictitious suit were Mr. Gomez personally, the substance is related to the merchant service chargeback from MyPetsProd from his business. And so this meets that minimal relationship test. The business had been closed at the time that the attorney's fees were incurred? Absolutely not, Your Honor. And so that's one of the fundamental factual disputes. I mean, to put it simply, there is a material issue of fact here regarding whether this was an act of business or not. Mr. Gomez's deposition transcript clearly states that she was actively involved. She prepared sales tax returns. She was infusing cash into the company. They were trying to get out. They were under the impression they were retired. They were retiring, you could say, Your Honor. But there was a 2017 tax return. They had retired. They had already retired though, right? Your Honor, I think they wanted to retire, but they weren't able to because the business continued to have issues that they were responsible for. The factual dispute about whether or not they were retired? Absolutely, Your Honor. You know, in terms of the relationship and what retirement would mean in the context of 162A, because going back to McKinney, that's dealing with the winding down of a business. What was the status of the business though? It had been closed and it wasn't in operation, was it? Your Honor, it absolutely was. Their daughter continued to run the business, but Mr. and Mrs. Gomez were still obligated for its activities at that time. They were, in essence, in the process of handing the baton off. But again, as shown by their 2017 tax return, that included a tax return from the S-Corporation for my pet's pride. That indicates, in the plain essence of the IRS's own forms, it was active. Let me ask you just very specifically while you've got a little bit of time left. What is it about the fake lawsuit that makes it business in character as opposed to personal liability in character? Everything that I see about the lawsuit and the record suggests that the reason why your clients were worried about this, the reason why they were susceptible to this fraud, is because they thought that they were on the hook personally and things like that. Absolutely, Your Honor. Just because there's a perception that there's personal liability or you might go to jail or whatever Ms. Anderson was persuading them they were facing, does not take away or detract from the business relationship that's underlying the nature of those expenses, those merchant chargebacks. I would point the court's attention to the fact that the district court doesn't even address it. I mean, once again, could you just be real specific? What is it, and I realize the lawsuit doesn't exist, so maybe this is unfair, but what is it about the fake lawsuit that says this is business related and not, you know, not everything that has something to do with a business gives you a business expense as far as, so I guess I'm trying to say like, if you look at McKinney and where we said that it wasn't business related, sufficient to get the deduction, what here says that this one is? Yes, Your Honor, because the underlying nature is related to the merchant service chargebacks. And I want to point a distinction because we're focusing solely, just like the trial court did, on the legal fee expenses. But a significant portion of the fraud was direct repayment of the merchant service chargebacks. In other words, Ms. Anderson would come to the Gomez's and say, remember all those people who paid us last year? They're disputing the charge because they didn't get a good service. They filed a fraud claim or whatever with their credit card issuer. We have to pay that back. We need to fund that. They were directly funding that through the business and they were paying it back. The lawsuit came later to try to recoup those payments. To be clear, Your Honor, there was fraud, not just from the lawsuit, but from the repayment of those merchant service chargebacks that the trial court didn't even address in their factual findings. It's as if they didn't even review the appellant's brief in the summary judgment stages of the proceedings. We didn't even have a real argument. All right, we have your argument. Thank you, counsel. Thank you, Your Honor.